IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | NO. 04-390-1 |
| v. | : | |
| | : | CIVIL ACTION |
| XANG SACKSITH | : | NO. 08-4620 |

## MEMORANDUM AND ORDER

Gene E.K. Pratter, J.                                                                                       June 3, 2010

## INTRODUCTION

Xang Sacksith confounded his counsel in 2004 because of his insistence on pleading guilty to a three-count indictment charging him with drug distribution crimes[1] even though that plea was certain to result in a mandatory life imprisonment sentence, given Mr. Sacksith's refusal to cooperate with the Government's investigation of others. Mr. Sacksith's superficially puzzling actions have continued to frustrate various defense counsel who, seriatim, have taken on the challenges of representing him. The latest endeavor on his behalf is the pending Amended Petition For Habeas Corpus Relief Pursuant to 28 U.S.C. §2255 (Doc. No. 163), which, for the reasons discussed in this memorandum, the Court denies.

## BACKGROUND

In large measure the extensive procedural history of this case, with the attendant safeguards demonstrably made available to Mr. Sacksith, mandates denial of the pending petition. Therefore, it is appropriate to recount in some detail the background of this case.

---

[1] Specifically, Mr. Sacksith was charged with, and eventually pled guilty to, violating 21 U.S.C. §§841(a)(1), 846 and 860 (a), and 18 U.S.C. §2.

1

Mr. Sacksith came to the United States from his native Laos in 1989 as a very young teenager. He attended public school in America through his early high school years. By his own account, and according to public records, he illegally used drugs and engaged in various illicit felony drug trafficking offenses, including two he committed in his early 20's for which he was convicted in the Court of Common Pleas of Philadelphia County.[2] In the normal course of governmental processes, Mr. Sacksith was ordered deported to Laos following these convictions, but the Laotian government's failure to respond to the deportation communiques resulted in Mr. Sacksith being released by the Immigration and Naturalization Service on or about February 24, 2003, subject to an order of supervision. Thus, he remained in the United States.

On June 10, 2004 Mr. Sacksith was arrested by DEA agents in Philadelphia as he attempted to broker the sale of approximately 10,000 ecstacy pills to a cooperating government witness for $65,000 from which Mr. Sacksith hoped to clear $10,000 for himself. Immediately prior to the arrest, a DEA cooperating witness had discussed with Mr. Sacksith the likelihood of making such a purchase. Mr. Sacksith had assured the putative purchaser that he could provide 10,000 pills as requested and proceeded to contact his co-defendant, Thanh Nguyen, to obtain the pills.

The day prior to his arrest Mr. Sacksith had given the cooperating witness three sample pills, and the two men struck a deal for the $65,000 purchase price for 10,000 pills. The pills were actually secured through the machinations of Mr. Sacksith's co-defendants, Mr. Nguyen, Duong Vu, and Toan Kim of the Benjamin Ton Drug Trafficking Organization. On the day of the actual transaction, Mr. Sacksith joined the other three in their car to drive to the appointed meeting place, a particular Dunkin' Donuts establishment that was located within 1,000 feet of a

---

[2]Mr. Sacksith was sentenced to one to two years imprisonment for his guilty plea conviction for possession of a controlled substance (crack cocaine and marijuana) with intent to deliver in violation of 35 P.S. §780–113(A)(30) stemming from a September 3, 1997 incident. He was also sentenced to one and a half to three years for his guilty plea conviction for possession of a controlled substance (crack cocaine) with intent to deliver in violation of 35 P.S. §780–113(a)(30) arising from a June 7, 1996 incident.

school. Mr. Sacksith accompanied Mr. Vu, who was physically carrying the pills in his backpack, into the donut shop to meet with the purchaser, who was secretly wearing a recording and transmitting device. Once DEA agents received the purchaser's signal, they arrested Messrs. Vu and Sacksith. A search of the backpack revealed a number of plastic bags containing various different colored pills, all of which were subsequently counted, measured, weighed, and analyzed under appropriate conditions.

On July 7, 2004, Messrs. Sacksith and Duong Vu were charged in a three-count indictment. The case was assigned to the docket of Honorable Marvin Katz[3]. Mr. Sacksith qualified for representation by the Federal Defender, and by June 17, 2004, the first of Mr. Sacksith's three very able, experienced and dedicated counsel entered an appearance on his behalf.

As of the time of the initiation of this prosecution, if eventually Mr. Sacksith was convicted of the crimes charged, the applicable Sentencing Guidelines placed him at an offense level 34 and criminal history category VI, resulting in a guideline range of incarceration for between 262 and 327 months. When he was arrested, Mr. Sacksith was 28 or 29 years old.

Reportedly, from the start of this prosecution Mr. Sacksith acknowledged his guilt and expressed an intention and desire to plead guilty. Proffer sessions, pursuant to an executed proffer letter, aimed at reaching a cooperation plea agreement were arranged and undertaken. Those efforts were ultimately to no avail because the Government personnel perceived that Mr. Sacksith was not telling them the complete truth. In particular, investigators concluded that Mr. Sacksith materially misled them concerning the relative conduct and culpability of co-defendants Vu and Nguyen, contrary to the information these co-defendants themselves imparted during their own proffer sessions and guilty plea hearings.

---

[3]Judge Katz has ceased actively presiding over cases, and on September 24, 2008 this case was reassigned to this Court for all purposes. (Doc. No. 145 in Cr. 04-390).

After the Sacksith proffers came to naught, and Mr. Sacksith disavowed any interest in cooperating with law enforcement officials, the Government filed an information notice on October 26, 2004, delineating the Government's intention to invoke 21 U.S.C. §851 for a mandatory life sentence due to Mr. Sacksith's two prior convictions. Presumably, the §851 notice was expected to encourage Mr. Sacksith to rethink his abandonment of cooperation activities and to return to making an effort to be helpful to the Government and himself. Contrary to those expectations, however, Mr. Sacksith remained intent upon pleading guilty without cooperating, even though he faced a certain mandatory life sentence. He so informed his then counsel, Edson Bostic. By the same token, Mr. Sacksith also informed Mr. Bostic that he would accept a "C plea" for a 20-year sentence in lieu of a life sentence if his counsel could secure the Government's agreement to such a proposal. Not surprisingly, the Government would not agree to a C plea in the absence of Mr. Sacksith's cooperation.

Accordingly, by the end of 2004 Mr. Sacksith had the choice to (1) go to trial on the charges, (2) enter a guilty plea without having cooperated with the Government which would lead to a mandatory life sentence against the strenuous advice of his counsel but which option Mr. Sacksith then reportedly favored, or (3) plead guilty having cooperated with the Government as a predicate to securing the Government's motion for a lesser sentence, a choice Mr. Sacksith eschewed but which his lawyer urged.

With a change of plea hearing necessarily looming, on November 16, 2004, Mr. Bostic filed a motion to withdraw as Mr. Sacksith's counsel. Judge Katz convened a hearing to address the motion on November 30, 2004. Even though Mr. Sacksith had at all times pertinent to this matter demonstrated functional facility with the English language[4], a Laotian interpreter was

---

[4]Mr. Bostic, as well as each of his two successors, explained to the Court that in all interactions between counsel and Mr. Sacksith or during court proceedings, Mr. Sacksith disavowed any need for an interpreter, but rather demonstrated an ability to understand spoken English, to raise
(continued...)

4

present for Mr. Sacksith if desired. The premise of counsel's withdrawal motion was that although counsel had devoted himself to vigorous representation of Mr. Sacksith, had met with his client, had met with Mr. Sacksith's girlfriend to outline the situation and had endeavored to hammer home to Mr. Sacksith that he would be sentenced to life in prison if he persisted in his intention to plead guilty while refusing to cooperate with the Government, Mr. Sacksith continued to refuse to follow counsel's advice. Positing that in spite of counsel's experience and skill, he had for some inexplicable reason failed to "get through" to Mr. Sacksith so that Mr. Sacksith could "see the light," Mr. Bostic suggested that perhaps some other defense counsel would succeed where he, Mr. Bostic, had failed. 11/30/04 N.T. at 5-6; 8. Understandably, Judge Katz asked Mr. Bostic:

> What would new counsel be able to do that
> you have not already done with your client;
> that's what I'm not clear on? 11/30/04 N.T. at 8.

Mr. Bostic could not give any specific response to the Court other than to emphasize generally the undeniable gravity of Mr. Sacksith's circumstances and express the hope that some other lawyer would be able to illuminate the path Mr. Bostic wanted his client to follow. 11/30/04 N.T. at 8-9.

The Government's counsel essentially echoed Mr. Bostic's account of the case to date:

> Both Mr. Bostic and I have told [Mr. Sacksith] that while the
> Court is frequently prone to be merciful to deserving
> people, that nonetheless there are legal limitations in
> what the Court can do. Absent the filling of motions,
> indicating that the person cooperated and therefore
> merits a consideration for downward departure, the Court
> is powerless to depart. [Mr. Sacksith] seems to accept
> this intellectually, not emotionally so far. . . . [H]e has

---

[4](...continued)
a question when clarification was needed, and to express himself in English. See, e.g., 11/30/04 N.T. at 7-8.

5

> maintained a consistent position ever since the initial
> [proffer] meeting, which is . . . he has consistently
> taken the position that he just wants to plead guilty and
> doesn't feel that he can cooperate because he is worried
> about endangering his family.
>
> Essentially what he said to us, if I have to go
> to jail for life, I go to jail for life. I'm just worried about
> doing something that will harm my family. 11/30/04 N.T. at 11.

When the Court turned to Mr. Sacksith at the hearing to give him the opportunity to speak if he wished, Mr. Sacksith's statements were not inconsistent with what the lawyers had recounted:

> I want the Court to know I'm responsible for everything
> that I did but this stuff, what I have - - I'm just a drug addict.
> I'm trying to make money on the side to support my high,
> and pay my bills. I never had any possession for what I see
> or do. All I know, I make a phone call to people.
>
> I would like to help the Government out, I'm
> afraid for my family and loved ones would get in trouble.
> I'm responsible for what I did, I deserve the punishment. I'm
> not going to take this case to trial. I know what I did was
> wrong. That's all I can say. 11/30/04 N.T. at 13.

After giving Mr. Sacksith and his counsel additional time to confer, Judge Katz denied counsel's request to withdraw, observing:

> . . . [I]t would serve no useful purpose. I can't imagine being
> able to get a more experienced or more able or conscientious
> attorney than the one who is presently defending Mr. Sacksith.
>
> There's no cause shown for the change that is
> requested. And, it just seems to me it would be pointless.
> There is nothing that a new attorney could add to what this
> attorney has done with regard to the case, as I understand it.
> 11/30/04 N.T. at 15-16.

One week later, on December 6, 2004, Mr. Sacksith returned to court for a change of plea hearing. Once again, a Laotian interpreter was available, but ultimately deemed superfluous.

6

Once again, defense counsel moved to withdraw as Mr. Sacksith's counsel and asked the Court to reconsider the prior ruling denying the withdrawal application. Once again, counsel could not specify grounds for the motion other than his evident frustration that Mr. Sacksith continued to decline to follow counsel's advice. 12/06/04 N.T. at 3-5. Opposing counsel took no position on defense counsel's motion but did confirm having witnessed defense counsel "explain[] the realities of his situation to [Mr. Sacksith] very clearly." 12/06/04 N.T. at 7-8. Like defense counsel, Government counsel described Mr. Sacksith as competent and fully understanding of his options, observing that Mr. Sacksith appeared to have reasons sufficient to himself for not following counsel's advice, and, finally, the prosecutor endorsed defense counsel's "fine representation" of Mr. Sacksith in keeping with "constitutional standards of effective assistance of counsel." Id.

As before, the Court gave Mr. Sacksith the opportunity to address the Court. He reiterated his knowledge of his guilt as well as his continued intention to plead guilty, notwithstanding his belief that his brokering conduct in connection with the drug transaction at issue should not lead to a life sentence. 12/06/04 N.T. at 10. The Court went ahead with the plea colloquy, denied the motion to reconsider the denial of counsel's motion to withdraw, and accepted Mr. Sacksith's guilty plea. The transcript of the plea hearing demonstrates that Mr. Sacksith knew that his guilty plea inexorably would lead to a mandatory life sentence unless he provided cooperation to law enforcement personnel. 12/06/04 N.T. at 13-14; 19-20; 31-34. He was also informed that the opportunity to cooperate and possibly ameliorate his life sentence would continue to be available even after sentencing. 12/06/04 N.T. at 34.

Approximately one month later and prior to sentencing, Mr. Sacksith tried a different tack. Specifically, contrary to virtually everything he had said at the two prior hearings, Mr. Sacksith twice wrote to the Court and accused his counsel of having tricked and/or coerced him into

7

a guilty plea. Among other things, Mr. Sacksith claimed that Mr. Bostic had told him he was facing a sentence of 10 to 12 years if he pled guilty. The Court permitted a substitution of counsel, Mr. Bostic's appearance was terminated and John Griffin, Esquire entered his appearance for Mr. Sacksith on March 23, 2005. After a number of continuances, Mr. Sacksith's sentencing hearing was finally set for November 1, 2005.

Three weeks before the sentencing was to take place, Mr. Griffin filed on Mr. Sacksith's behalf a Motion to Withdraw Guilty Plea. The grounds for the motion were that Mr. Sacksith had not understood the severity of the consequences of his guilty plea and had not fully understood the plea proceedings and thought he would be getting a 10 to 12 year sentence. The Court scheduled a hearing on the motion for November 1, 2005, immediately in advance of the scheduled sentencing hearing. Again, an interpreter was in attendance to assist Mr. Sacksith if needed. 11/01/05 N.T. at 11; 16-21. Prior counsel, Mr. Bostic, was called as a witness. Mr. Bostic explained that he did not believe Mr. Sacksith had any material English language comprehension problems, and recounted the repeated times that Mr. Sacksith had been told about the mandatory life sentence by Mr. Bostic himself, by the prosecutor, by the DEA agents and by the Court. Mr. Bostic flatly denied ever telling Mr. Sacksith that he would be sentenced to 10 to 12 years if he pled guilty. 11/01/05 N.T. at 11; 16-21; 26-28.

Following the presentation of the evidence[5], the Court heard argument on the law applicable to a motion to withdraw a guilty plea. The Court denied the motion, finding that it was

---

[5]During Mr. Bostic's testimony and the presentation of evidence, the interpreter translated the proceedings for Mr. Sacksith. Because Mr. Sacksith indicated he understood what was being said, the interpreter did not translate the attorneys' arguments unless Mr. Sacksith requested translation. 11/01/05 N.T. at 48-53. Judge Katz ruled there was no necessity to re-read the arguments back for purposes of requiring contemporaneous translations of the arguments.

clear that Mr. Sacksith understood the consequences of the guilty plea and that the newly framed claim that prior defense counsel had promised him some lower sentence was "completely false" and indicative of the fact that "[Mr. Sacksith was] simply trying to play the system . . ." 11/01/05 N.T. at 53. The Court then proceeded with sentencing and imposed the mandatory life sentence. 11/01/05 N.T. at 68. Mr. Sacksith appealed, and the Third Circuit Court of Appeals affirmed Judge Katz on September 21, 2007. United States v. Sacksith, 248 Fed. Appx. 430 (3d Cir. 2007). Three weeks later, Mr. Sacksith's Petition for Rehearing and Rehearing En Banc and for Supplemental Briefing was denied.

A year later Mr. Sacksith initiated pro se 18 U.S.C. §2255 efforts.[6] After this matter was transferred to this Court's docket, new counsel, namely Richard G. Freeman, Esquire, was appointed to represent Mr. Sacksith. Because Mr. Sacksith's various pro se motions were denied without prejudice, Mr. Freeman was given time to consider what, if any, grounds to present for an amended §2255 application on Mr. Sacksith's behalf.

Mr. Freeman did present an Amended Petition for Habeas Corpus Relief for Mr. Sacksith, which the Government opposed. The Court held an evidentiary hearing on the Amended Petition on February 16, 2010. Once again, a Laotian interpreter attended, in the event Mr. Sacksith needed or desired such services.[7] The grounds for relief presented in this chapter of Mr. Sacksith's proceedings are that both of Mr. Sacksith's prior counsel (namely, Messrs. Bostic and Griffin) provided him with ineffective assistance because they made no investigative effort into the

---

[6]The various activities relating to the pro se efforts of Mr. Sacksith and the Government's responses appear on the docket for CR 04-390.

[7]Mr. Sacksith's counsel confirmed on the record that, once again, Mr. Sacksith did not need the services of the interpreter. 2/16/10 N.T. at 68.

9

underlying charges and, if such effort(s) had been made, it is possible that Mr. Sacksith would not have pled guilty in the first instance, or a more persuasive argument possibly could have been made to support withdrawal of the guilty plea, and/or Mr. Sacksith's role in the drug transaction at issue might have been characterized as minor or minimal.[8]

Mr. Bostic was again called as a witness. He recounted much the same recollections as in his prior testimony or arguments to the Court about his representation of Mr. Sacksith. Under additional questioning, Mr. Bostic added that Mr. Sacksith "did not provide much information to me, other than acknowledging to me that he was involved in this matter and that he wanted to plead guilty." 02/16/10 N.T. at 20; 21. In response to the question of whether he considered mounting an investigation of Mr. Sacksith's role in the drug transaction so as to possibly minimize that role or establish a defense for trial, Mr. Bostic explained that Mr. Sacksith's own description of his actions caused Mr. Bostic to believe that "Mr. Sacksith played an active role in obtaining and helping the delivery of these drugs." 02/16/10 N.T. at 22-23. Thus, according to Mr. Bostic, rather than a factual investigation the defense strategy turned to the possibility of cooperating with the Government, leading to the on-again-off-again proffer sessions and guilty plea discussions described previously.

Mr. Bostic stated plainly and under oath that at some point during these proffer discussions Mr. Sacksith decided he no longer wanted to try to cooperate with the Government but insisted on pleading guilty, even though Mr. Sacksith certainly would be considered a "career offender" and would be sentenced to life in prison. 2/16/10 N.T. at 24-25. Mr. Bostic also stated unequivocally that he did not engage an investigator to look into the facts of the case against Mr.

---

[8]These same arguments could have been made in 2005 when the motion to withdraw the guilty plea was presented and an appeal taken.

Sacksith for several reasons, namely, initially because Mr. Sacksith was going to cooperate with the Government, but eventually because Mr. Sacksith never gave Mr. Bostic any indication that there were any witnesses who could be helpful to Mr. Sacksith in the case. 2/16/10 N.T. at 29-32. Indeed, Mr. Bostic stated plainly that Mr. Sacksith's insistence on pleading guilty, together with his failure to give Mr. Bostic "any room or ability to try this case" was the reason Mr. Bostic undertook no trial preparation activities. 2/16/10 N.T. at 35-36; 38-40; 53; 60; 63-64. Essentially, based upon the information made available by Mr. Sacksith or his girlfriend, even when supplemented by information available from interactions with the Government investigators or counsel for the co-defendants, Mr. Bostic could not hazard a guess as to what, if anything, any investigator could have developed that would have been pertinent - - much less helpful - - to Mr. Sacksith's case. Indeed, the magnitude of the Government's evidence of Mr. Sacksith's guilt, including the taped statements of Mr. Sacksith himself, only underscored the validity of Mr. Sacksith's repeated admissions of his guilt. Finally, Mr. Bostic acknowledged that, as frustrated and as flummoxed as he was by Mr. Sacksith's refusal to follow his professional advice, he did not consider Mr. Sacksith to be incompetent. 2/16/10 N.T. at 58-60.

    The lawyer who replaced Mr. Bostic, John Griffin, also testified at the February 16th hearing about the services he rendered to Mr. Sacksith. Mr. Griffin explained his efforts to persuade the Court to allow Mr. Sacksith to withdraw his guilty plea. Mr. Griffin, like Mr. Bostic, thought Mr. Sacksith's circumstances only would be improved if he would cooperate with the Government. 2/16/10 N.T. at 73. And, also like Mr. Bostic, Mr. Griffin was aware of no basis on which to argue that Mr. Sacksith had a colorable defense to the charges against him. Indeed, Mr. Griffin acknowledged that in connection with the effort to withdraw the guilty plea and otherwise Mr. Sacksith did not protest that he was innocent. 2/16/10 N.T. at 75-76. Furthermore, and also like Mr.

Bostic, Mr. Griffin did not ever have a reason to question Mr. Sacksith's competence. 2/16/10 N.T. at 76-77. Mr. Griffin candidly testified that, beyond his lack of success in persuading the Court to permit withdrawal of the guilty plea, there was no available basis under applicable sentencing law to ameliorate the application of the mandatory life sentence. 2/16/10 N.T. at 82-85. Mr. Griffin acknowledged that the Government continued to "let that [co-operation] door remain open, but I did not have a client that would allow me to walk through that door, and I very much wanted to walk through that door because I was cognizant of the uphill battle I had post plea, pre-sentencing, trying to get a motion to withdraw [the guilty plea] granted." 2/16/10 N.T. at 85.

Messrs. Bostic and Griffin were the only witnesses called by Mr. Sacksith to justify the § 2255 petition. No other evidence was offered. In response, the Government submitted a stipulated offer of proof relating to the senior forensic chemist at the DEA Northeast Regional Laboratory in New York City who would testify that the pills secured from the transaction that prompted the arrest of Mr. Sacksith contained methamphetamine. 2/16/10 N.T. at 91-96.[9] Once both parties rested, the Court permitted them to file written submissions once the transcript from the hearing was available to them.

**DISCUSSION**

Mr. Sacksith's petition must be judged against the standards of 28 U.S.C. § 2255 which provides that:

> A [federal] prisoner in custody under sentence of a court...may move the court which imposed the sentence to vacate, set aside or correct the sentence. Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court

---

[9] Initially, in the pro se §2255 petition, Mr. Sacksith had challenged this aspect of the Government's underlying case. Even though new counsel confirmed that such grounds were deemed abandoned, the Government opted to address the issue nonetheless.

> shall cause notice thereof to be served upon the United States
> attorney, grant a prompt hearing thereon, determine the issues and
> make findings of fact and conclusions of law with respect thereto...

As is clear from the foregoing recitation of the background of this case, a hearing was held, even though in this case it could be persuasively argued that the § 2255 motion was raising only issues that had been litigated previously and decided against Mr. Sacksith. See, e.g., United States v. Leiby, 820 F.2d 70 (3d Cir. 1987). At that hearing and pursuant to the petition, Mr. Sacksith bears the burden of proof by a preponderance of the evidence. Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000); Langston v. United States, 105 F.Supp. 2d 419, 422 (E.D.Pa. 2000). See also, Wright, King, Klein & Welling, 3 Fed. Prac. & Proc. Crim. 3d § 600.

In this instance, Mr. Sacksith's latest argument has been that his counsel, Messrs. Bostic and Griffin, were ineffective in their assistance to him. It was his burden to demonstrate that ineffectiveness. The analysis starts with Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court held that the proper standard for attorney performance is that of reasonably effective assistance. Mr. Sacksith is obliged to satisfy two prongs:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced the defense. This requires
> showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687. See also United States v. DeRewal, 10 F.3d 100, 104 (3d Cir. 1976).

To show prejudice,[10] Mr. Sacksith must show that there is a reasonable probability that there would have been a different outcome, i.e., that the deficient performance deprived Mr. Sacksith of proceedings whose results were reliable. DeRewal, 10 F.3d at 104. Under Strickland, a "reasonable probability" is one sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694.

To demonstrate the first Strickland prong, that is, representational deficiency, Mr. Sacksith must show, without merely invoking the convenient clarity of hindsight, that his lawyers' conduct fell below an objective standard of reasonableness.[11] Strickland, 466 U.S. at 688-90. Thus, the Court's examination of the services of Messrs. Bostic and Griffin should be highly deferential. Diggs v. Owens, 833 F.2d 439, 444-45 (3d Cir. 1987).

The current upshot of Mr. Sacksith's § 2255 motion is that first Mr. Bostic, and then Mr. Griffin, failed to investigate Mr. Sacksith's role in the crimes to which he pled guilty and that if they had undertaken an investigation they "might have been" able to moderate or ameliorate in some way the Government's view of Mr. Sacksith's involvement in the illegal transaction to consider him a minor or minimal participant. If that was possible, Mr. Sacksith's argument goes, then perhaps, too, there could have been a sentence below life imprisonment.

The fundamental flaw in this argument is that both Mr. Bostic and Mr. Griffin testified that not only did Mr. Sacksith never tell them about any information to prompt any

---

[10]Our Court of Appeals has sensibly made the practical observation that the second prong, i.e., prejudice, ought to be examined first. United States v. Booth, 432 F.3d 542, 546 (3d Cir. 2005).

[11]No affirmative evidence concerning the applicable standard of care for professionals in the circumstances of Mr. Bostic or of Mr. Griffin was offered by Mr. Sacksith. If Mr. Sacksith had satisfied the prejudice prong, the Court would have discussed at length the significance of the absence of evidence of the objective standard of care. Suffice it to say, that the absence of such evidence is yet another failing of Mr. Sacksith's arguments here.

14

investigation, but neither did anyone else ever impart any such information. No other evidence suggested (then, or now) any avenue for investigation. Of course, speculation and guesswork is at best an illusory foundation for Mr. Sacksith's arguments that cannot support a viable prejudice argument. Here, there is the added actual obstacle, namely, Mr. Sacksith's repeated virtual insistence that no investigation be undertaken, given Mr. Sacksith's determination to plead guilty.

Mr. Sacksith now suggests that even through he repeatedly admitted his responsibility and participation in the crime and was planning to plead guilty, his lawyers could have tried to develop some sort of factual justification so that Mr. Sacksith could try to secure a downward adjustment under Guideline § 3B1.2 by claiming minor or minimal participant status. This argument, too, comes to naught given the record here. As the Government has correctly noted, when Mr. Sacksith directly appealed the denial of his motion to withdraw his guilty plea, the Third Circuit Court of Appeals declined to accept his protestations that he did not physically possess the drugs at issue as tantamount to a claim of innocence. Sacksith, 248 Fed. Appx. at 435-36. Indeed, Mr. Sacksith could not advance an argument of innocence, given his admissions that he (1) told the putative purchaser he could arrange a transaction for a significant quantity of drugs, (2) he made the requisite calls, (3) he set up the actual transaction, and (4) he accompanied the actual seller to the location for the sale. These brokering activities could hardly be recast or re-characterized as minor or minimal - - indeed, it would not have been out of the realm of reality to hear Mr. Sacksith's own acts characterized as the aggravating activities of an "organizer" pursuant to Guideline § 3B1.1. Moreover, there is no basis in law or in fact to inexorably equate being less culpable than others with being a minor or minimal player. See, generally, United States v. Ray, 35 F.3d 354 (8th Cir. 1994); United States v. Sostre, 967 F.2d 728 (1st Cir. 1992); United States v. Alvardo, 909 F.2d 1443 (10th Cir. 1990).

Moreover, Mr. Sacksith's arguments completely overlook the practical reality of the situation of his own making: in the absence of the Government's § 5K1.1 and § 3553(e) motion (which only would have been forthcoming in response to meaningful cooperation that Mr. Sacksith knowingly refused to provide) Mr. Sacksith's two prior drug trafficking felony convictions and the § 851 information <u>mandated</u> the life sentence, rendering the idea of minor/minimal participant status meaningless in any case. <u>See</u>, <u>e.g.</u>, <u>United States v. Moore</u>, 304 Fed. Appx. 50, 52 (3d Cir. 2008); <u>United States v. Tannis</u>, 942 F.2d 196, 198 (3d Cir. 1991). The record is clear that Mr. Sacksith himself - - quite unrelated to anything his lawyers did or did not do - - made sure that the Government would not move under § 3553(e) or § 5K1.1 when he failed to be truthful in the effort he initially made to cooperate and then refused to cooperate at all.[12]

Therefore, even if one or both of Mr. Sacksith's earlier attorneys had fallen short of the applicable standard of care (of which theoretical shortcoming there is no evidence), Mr. Sacksith was the master of his own fate: he admitted his participation in the drug transaction at issue, he provided his counsel no factual or potential information to investigate or witnesses to interview, he was only partially truthful to the extent he undertook any cooperation efforts and gave misleading or untruthful information about his cohorts, he accepted terms of a proffer letter, he openly and repeatedly admitted his conduct, and he insisted on pleading guilty without cooperating against his lawyer's advice and after having been repeatedly told that to do so would surely lead to life imprisonment.[13]

---

[12] The cases that Mr. Sacksith tries to invoke on this issue are materially distinguishable from the "very novel and perhaps tenuous argument" advanced by Mr. Sacksith now. Mem. of Petitioner, Doc. 169, at 7.

[13] The Court recognizes that none of Mr. Sacksith's lawyers (given their uniform view that he was legally and language-wise competent) have been willing to accept - - or understand - - Mr.
(continued...)

## CONCLUSION

Mr. Sacksith, having now enjoyed the skills and energies of a third capable attorney, has not sustained his burden under 28 U.S.C. § 2255, and his Amended Petition for Habeas Corpus Relief is **DENIED**. An appropriate Order follows.

BY THE COURT:

/s/ Gene E.K. Prater
GENE E.K. PRATTER
United States District Judge

---

[13](...continued)
Sacksith's repeated insistence on pleading guilty in the face of a mandatory life sentence if he did not cooperate with law enforcement. Having reviewed several times the transcripts of the pertinent proceedings, the Court concludes that Mr. Sacksith expressed a sufficiently rational analysis and reasoning in expressing over and over again his decision to plead guilty - - even if it was not a decision that counsel or the Court would elect in the same circumstance. Given that there is no basis on which to think that Mr. Sacksith was incompetent or that he was not provided necessary information that he understood, Mr. Sacksith's power over his own decision-making deserves to be respected. It may be that his counsel adheres to the Platonic metaphor of the rational brain as the charioteer managing two powerful horses - - one fully controllable and the other less noble and more obstinate - - to explain their puzzled frustration with Mr. Sacksith. See Plato, Phaedrus, trans. by Alexander Nehamas & Paul Woodruff, New York: Hackett, 1995. However, considering the behavior of human beings - - who are most certainly not designed as wholly rational creatures - - that charioteer metaphor is no more useful than the modern metaphor of the mind as a computer. It is simply undeniable that whenever someone makes a decision, even when the person tries to be reasonable and restrained, personally-driven impulses influence his or her judgment. We cannot escape the realization that a human being is not either wholly rational or wholly irrational. There is no more universal solution to the problem of decision-making, any more than there is a universal template for how a human being will choose to live his or her life.